IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITES STATES OF AMERICA, | ) |
| THE STATE OF CALIFORNIA, | ) |
| THE STATE OF CONNECTICUT, | ) |
| THE STATE OF DELAWARE, | ) |
| THE DISTRICT OF COLUMBIA, | ) |
| THE STATE OF FLORIDA, | ) |
| THE STATE OF GEORGIA, | ) |
| THE STATE OF HAWAII, | ) |
| THE STATE OF ILLINOIS | ) |
| THE STATE OF INDIANA, | ) |
| THE STATE OF LOUISIANA, | ) |
| THE STATE OF MARYLAND, | ) |
| THE COMMONWEALTH OF MASSACHUSETTS, | ) |
| THE STATE OF MICHIGAN, | ) |
| THE STATE OF MONTANA, | ) |
| THE STATE OF NEVADA, | ) |
| THE STATE OF NEW HAMPSHIRE, | ) |
| THE STATE OF NEW JERSEY | ) |
| THE STATE OF NEW MEXICO, | ) |
| THE STATE OF NEW YORK, | ) |
| THE STATE OF NORTH CAROLINA, | ) |
| THE STATE OF OKLAHOMA, | ) |
| THE STATE OF RHODE ISLAND, | ) |
| THE STATE OF TENNESSEE, | ) |
| THE STATE OF TEXAS, | ) |
| THE COMMONWEALTH OF VIRGINIA, AND | ) |
| THE STATE OF WISCONSIN, | ) |
| EX REL.JEFFREY D'AGOSTINO AND JOHN DOE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| ev3, Inc., | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT PURSUANT TO**
**THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *ET SEQ*.**
**AND PENDENT STATE FALSE CLAIMS ACTS**

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ............................................................................... 2

II.     JURISDICTION AND VENUE ............................................................................. 5

III.    THE PARTIES..................................................................................................... 5

IV.     THE LAW APPLICABLE TO THE SALE AND USE OF MEDICAL DEVICES .......... 7

        A.      Government Regulation of Medical Devices............................................7

        B.      The False Claims Acts ............................................................................10

        C.      The Anti-Kickback Statute .....................................................................11

V.      THE FDA APPROVAL OF ONYX ...................................................................... 13

VI.     THE MARKET FOR ONYX................................................................................ 16

VII.    KICKBACKS AND THE OFF-LABEL PROMOTION OF ONYX.............................. 19

        A.      The Onyx Training Program:  Creating the Off-label Pipeline ...............19

        B.      Using Revenue Quotas to Drive Off-label Promotion............................23

        C.      Conference Calls, Regional Meetings, And National Sales Meetings...................24

        D.      Basic and Advanced Training:  Direct Off-label Training of Physicians.............32

        E.      Using Educational Grants to Generate Off-label Journal Articles and Case Studies Which Were Later Used as Promotional Pieces ........................................35

        F.      Speaker Bureaus and "Referral Dinners" ...............................................36

        G.      Targeting Off-Label Doctors ..................................................................37

        H.      Off-Label Broadcast Voicemails .............................................................41

        I.      Off Label Cell Phone Pictures, Broadcast Emails, and the Embo Club ................41

        J.      Dissemination of Off-Label Journals, Clinical Reviews, and Whitepapers ..........44

VIII.   EV3 CAUSED THE SUBMISSION OF FALSE ONYX CLAIMS ................................ 46

        A.      The Hospital Billing Process ...................................................................46

        B.      The Physician Billing Process .................................................................47

i

C.    Off-label Uses Of Onyx Are Not Reimbursable ..................................................... 47

D.    EV3 Knowingly Caused the Submission Non-Reimbursable Claims and Incurred FCA Liability .......................................................................................... 49

E.    EV3 Made False Statements When Promoting Onyx for Off-label Uses and Incurred FCA Liability .......................................................................................... 49

F.    EV3 Engaged in a Fraudulent Course of Conduct that Violated the Anti-Kickback Statute and, Consequently, the FCA.......................................... .................... 50

G.    False Claims By EV3 Caused Harm to the Government ........................................ 52

       1.    False Cost Reports and False DRG Reimbursement Requests .................. 52

       2.    Outlier Payments, and Consequential Damages Due to Patient Harm ...... 53

       3.    Onyx v. Conventional Treatment ............................................................... 56

IX.    THE LAW APPLICABLE TO THE SALE AND USE OF AXIUM COILS ................. 56

A.    Defective Products ................................................................................................ 56

B.    Adulterated, Misbranded, or Medically Unnecessary Devices .............. ................. 57

X.    EV3 SOLD DEFECTIVE AND MEDICALLY UNNECESSARY AXIUM COILS ..... 58

XI.    EV3 KNOWINGLY CAUSED THE SUBMISSION OF FALSE AXIUM CLAIMS .... 61

XII.    THE LAW APPLICABLE TO THE REPORTING OF ADVERSE EVENTS .............. 62

XIII.    THE LAW APPLICABLE TO THE RECALL OF MEDICAL DEVICES .................... 63

XIV.    EV3 KNOWINGLY FAILED TO MEET ITS REPORTING OBLIGATIONS AND DECEIVED THE FDA ...................................................................................................... 64

XV.    BY FAILING TO MEET ITS MANUFACTURING AND REPORTING OBLIGATIONS, EV3 CAUSED THE SUBMISSION OF FALSE ONYX AND AXIUM CLAIMS .................................................................................................................... 67

XVI.    EV3 RETALIATED AGAINST RELATOR D'AGOSTINO .......................................... 68

REQUESTS FOR RELIEF ........................................................................................................ 114

Plaintiff(s) Jeffrey D'Agostino and John Doe (hereinafter collectively known as "Relators") bring this action on behalf of the United States of America, the State of California, the State of Delaware, the District of Columbia, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Montana, the State of Nevada, the State of New Jersey, the State of New Hampshire, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, and the State of Wisconsin (hereinafter referred to as the "Plaintiff States"), against ev3, Inc. ("EV3") for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 372 et seq., and for violations of the following State False Claims Acts ("State FCA's"): The California False Claims Act, Cal. Govt. Code §§ 1265 *et seq.*; The Connecticut False Claims Act, Conn. Gen. Stat. §§ 17b-301b; The Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, §§ 1201 *et seq.*; The District of Columbia False Claims Act, D.C. Code Ann. §§ 2-3-8.03 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168, *et seq.*; The Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*; The Illinois Whistleblower Reward and Protection Act, 74 Ill. Comp. Stat. Ann. §§ 175/1 *et seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5 *et seq.*; The Louisiana Medical Assistance Programs Integrity Law, La. R.S. §§ 46:437.1 *et seq.*; The Maryland False Health Claims Act, Title 2, Subtitle 6, §2-601 *et seq.*; The Massachusetts False Claims Act, Mass. Ann. Laws. Ch. 12, §§ 5A *et seq.*; The Michigan Medicaid False Claims Act, MI Public Act 337, Public Acts of 2005, MCLS §§ 400.601 *et seq.*; The Montana False Claims Act, Mont. Code Anno. §§ 17-8-401 *et seq.*; The Nevada Submission of False Claims to State or

1

Local Government Act, Nev. Rev. Stat. §§ 357.01 *et seq.*; The New Hampshire False Claims Act, RSA tit. XII, Ch. 16761-b; The New Jersey False Claims Act, N.J. State §§ 2A:32C-1 *et seq.*; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; The New York False Claims Act, NY State Fin. Law §§ 187 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§ 1-605 *et seq.*; The Oklahoma Medicaid False Claims Act, Stat. tit. 63 §§ 5053 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas False Claims Act, Tex. Hum. Res. Code §§ 36.001 *et seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1 *et seq.*; and The Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§ 20.931, to recover all damages, civil penalties and all other recoveries provided for under the Federal FCA and the State FCA's.

## I. SUMMARY OF THE ACTION

1.      Defendant ev3, Inc. ("EV3") designs, manufactures, and markets medical devices. One of these devices is known as the Onyx Liquid Embolic System ("Onyx"). Onyx is "an artificial material used to block blood flow in the treatment of abnormally formed (malformed) blood vessels in the brain."

2.      Onyx was approved by the Food and Drug Administration ("FDA") on July 21, 2005 for pre-surgical use in a narrow category of brain procedures. It was expressly not approved as a long-term implant nor was it approved to treat dural arteriovenous fistulas ("DAVF's"), or children. The evidence shows that both before and after the FDA approval – and up until the present time – the Defendant engaged in a successful nationwide off-label marketing campaign which involved marketing Onyx as a long-term implant, and marketing Onyx for use throughout the entire human body, including with respect to the following medical conditions:

•      Benign and malignant tumors

2

- Surgical wounds
- Dural Arteriovenous Fistulas
- "Pseudo" aneurysms
- Iliac artery aneurysms
- Varicoceles
- Bleeding arteries
- Portal veins
- "Vein of Galen" lesions
- Type II Endoleaks
- Arteriovenous Fistulas
- Carotid Cavernous Fistulas

3.     Many of these off-label procedures caused patients serious harm, and sometimes death. By these actions, as described in detail below, the Defendant misbranded Onyx and caused the submission of false claims to the Federal and State Governments.

4.     The Defendant also manufactures a detachable coil system marketed under the trade name "Axium Detachable Coil System" ("Axium"). Axium coils are used to block blood flow to intracranial aneurysms and other neurovascular abnormalities.

5.     In the Fall and Winter of 2008, the number of adverse events related to Axium rose sharply. The Defendant was advised on numerous occasions that physicians were having difficulty with the coils and that patients were being hurt. More specifically, the Defendant was repeatedly informed that physicians were having problems "detaching" Axium coils from the devices used to place the coils at the intended site. Moreover, in or about February 2009, the Defendant became aware of the reason for the spike in adverse events: it had improperly manufactured the coils. Specifically, the Defendant learned that it had "over-welded" the coils in the area where the coil was designed to detach. This caused surgeons to have great difficulty removing catheters from the bodies of their patients, which led to significant and potentially fatal

3

complications. Despite direct knowledge that the device was faulty, the Defendant continued to sell the defective product to hospitals, which caused the submission of false claims to the Federal and State Governments.

6.      In addition to the off-label marketing of Onyx and the sale of defective Axium coils, the Defendant engaged in a widespread pattern of violating its federal manufacturing and adverse-event reporting obligations with respect to Onyx and Axium.  Under federal law, a device manufacturer that becomes aware of information that reasonably suggests that the device: a) may have caused or contributed to a serious physical injury or death, or b) had malfunctioned and the device would be likely to cause or contribute to a death or serious injury if the malfunction recurred, is required to report the incident to the FDA.  These reports are known as Medical Device Reports ("MDR's").  The FDA makes MDR's available to physicians and the public so that they can be aware of the risks of the device.

7.      The use of Onyx and Axium coils routinely resulted in incidents which should have been reported to the FDA and made available to physicians and the public.  Had EV3 followed its reporting obligations, the use of Onyx and Axium would have caused the FDA to recall one or both of these products, or caused the FDA to severely restrict their use.  Moreover, the government would have determined that the use of Onyx by untrained physicians, or the use of defective Axium coils, were not reimbursable under federally funded healthcare plans.  By failing to follow its manufacturing and reporting obligations, and by causing hospital and doctors to falsely certify their compliance with applicable statutes and regulations, EV3 caused hospitals and doctors to submit false claims to the Federal and State Governments.

4

## II.  JURISDICTION AND VENUE

8.      Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the "False Claims Act"), 31 U.S.C. § 372 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.  The Relators are the original source of the facts and information alleged in this complaint, and thus jurisdiction is not barred by 31 U.S.C. § 3730(e).

9.      Venue in the District of Massachusetts is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, the Defendant transacted business in the District of Massachusetts, and caused the submission of false claims involving Onyx and Axium coils in the District of Massachusetts.

## III. THE PARTIES

10.      EV3 is a corporation organized under the laws of Delaware, with its principal place of business in Plymouth, Minnesota.  EV3 is a global health care company engaged in the discovery, development, manufacture and marketing of medical devices.

11.      The United States is a plaintiff to this action.  The United States brings this action on behalf of the Department of Health and Human Services ("DHHS"), the Center for Medicare and Medicaid Services ("CMS"), and other federally funded healthcare programs including Medicare, State Medicaid Programs, TRICARE, and the Veterans Administration.

12.      Medicare is a government health insurance program for those 65 years or older, and those with certain disabilities.  42 U.S.C. §§ 426, 426A.  Medicare is administered by the CMS which is part of the Department of Health and Human Services.

13.      TRICARE/CHAMPUS ("TRICARE") is a federally funded program that provides medical benefits to military personnel, their families, retired veterans, and reservists called to duty.  32 C.F.R. § 19 *et seq.*

14.    The Veterans Administration ("VA") is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

15.    Throughout the relevant time periods specified herein, Onyx and Axium coils were provided to recipients of benefits from Medicare, TRICARE, the Veterans Administration, and other federally funded healthcare programs.

16.    The Medicaid Program, 42 U.S.C. § 1396 *et seq.*, is a government health insurance program funded jointly by the federal and state governments. Each State administers its own Medicaid program, however, each State program is governed by Federal statutes, regulations and guidelines. The federal portion of States Medicaid payments – the Federal Medical Assistance Percentage – is based on a States per capita income compared to the national average. During the relevant time period, the federal portion consisted of a minimum of 50% up to a maximum of roughly 80%.

17.    All of the Plaintiff States are plaintiffs in this action. On information and belief, at all times material to this complaint, Onyx and Axium coils were provided to Medicaid recipients in all of the Plaintiff States and were paid for by the Medicaid Programs in all of the Plaintiff States.

18.    Relator, Jeffrey D'Agostino, is a citizen of the United States and a resident of New Hampshire. While employed at EV3 from January 2005 through January 12, 2010, Relator D'Agostino worked as a Territory Manager ("TM") in the Eastern Region of the United States. In effect, a TM is a sales representative. Relator D'Agostino sold, among other things, Onyx and Axium coils. Relator D'Agostino has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1) and analogous provisions in the State FCA's. Relator D'Agostino brings this action

6

on behalf of the United States for violations of the Federal False Claims Act and on behalf of
each Plaintiff State named herein for violations of its respective State False Claims Act.

19.     Relator John Doe is a citizen of the United States.  Relator John Doe has standing
to bring this action pursuant to 31 U.S.C. § 3730(b)(1) and analogous provisions in the State
FCA's.  Relator John Doe brings this action on behalf of the United States for violations of the
Federal False Claims Act and on behalf of each Plaintiff State named herein for violations of its
respective State False Claims Act.

## IV.  THE LAW APPLICABLE TO THE SALE AND USE OF MEDICAL DEVICES

### A.    Government Regulation of Medical Devices

20.     Congress enacted the Medical Device Amendments of 1976, 21 U.S.C. § 360c *et
seq.* ("MDA"), to supplement the Food Drug and Cosmetic Act ("FDCA") and to "provide for
the safety and effectiveness of medical devices intended for human uses."  Pub. L. No. 94-295, 9
Stat. 539, 53(1976)(preamble).  The MDA conferred greater authority on the Food and Drug
Administration ("FDA") to regulate medical devices and to prevent devices lacking evidence of
safety and effectiveness from being marketed in the United States.

21.     The Center for Devices and Radiological Health ("CDRH") is the FDA regulatory
office which has the responsibility to protect the health and safety of American consumers by
ensuring that medical devices designed for use in the human body are safe and effective for their
intended uses and are accurately labeled.

22.     A medical device is "an instrument, apparatus, implement, machine, contrivance,
implant, in vitro reagent, or other similar or related article, including any component, part, or
accessory, which is . . . (2) intended for use in the diagnosis of disease or other conditions, or in

the cure, mitigation, treatment, or prevention of disease, in man or other animals. . . ." 21 U.S.C. § 321(h).

23.     Pursuant to its authority under the MDA, the FDA established three risk-based classifications for medical devices. Classes I, II, and III represent low, moderate, and high-risk categories based on the intended use of the device.

24.     Class I devices, such as bandages, are considered relatively safe and thus are the least regulated. Such devices are subject to basic controls, e.g., good manufacturing processes, which the FDA finds "sufficient to provide a reasonable assurance of safety and effectiveness." 42 C.F.R. § 405.201(b).

25.     Class II devices, such as thermometers, powered wheelchairs, and blood pressure cuffs, pose a moderate risk to patients and thus require special controls to provide reasonable assurance of safety and effectiveness. 42 C.F.R. § 405.201(b). Axium is a Class II device.

26.     Class III devices are those for which general and/or specific controls are not sufficient to provide reasonable assurance of safe and effective use. Such devices generally include life-supporting and life-sustaining devices which present a high risk of injury or illness to the patient, such as pacemakers, heart valves, and coronary stents. 42 C.F.R. § 405.201(b). For purposes of reimbursement by CMS, Class III devices are categorized as either Category A or Category B. Category A devices are innovative technologies "for which 'absolute risk' of the device type has not been established (that is, initial questions of safety and effectiveness have not been resolved and the FDA is unsure whether the device type can be safe and effective)." 42 C.F.R. § 405.201(b). Category A devices are considered to be experimental and investigational.

8

27.     Category B devices are devices "for which the incremental risk is the primary risk in question (that is, underlying questions of safety and effectiveness of that device type have been resolved), or it is known that the device type can be safe and effective because, for example, other manufacturers have obtained FDA approval for that device type." Category B devices are considered to be non-experimental, but still investigational. 42 C.F.R. § 405.201(b). Onyx is a Class III, Category B device.

28.     Prior to promoting or marketing a Class III device, the FDA requires companies to complete the "premarket approval process." Premarket approval ("PMA") is the most stringent level of device regulation required by FDA. The PMA process requires a manufacturer to furnish detailed information about the devices clinical testing, design, manufacturing, packaging, and labeling sufficient to reasonably assure the FDA that the device is safe and effective. 21 C.F.R. §§ 814 & 860.7 *et seq.* The PMA process is designed "[t]o ensure the disapproval of PMA's for devices that have not been shown to be safe and effective or that do not otherwise meet the statutory criteria for approval." 21 C.F.R. § 814.2.[1]

29.     At the conclusion of the PMA process, the FDA issues to the PMA applicant an "approvable letter" or "not approvable letter" for the medical device. 21 C.F.R. § 814.44(e) & (f). Notwithstanding the receipt of an approval letter, a device manufacturer is not permitted to promote or market a device "off-label," i.e., for indications not specifically approved by the FDA. 21 U.S.C. §§ 312.7 & 331(a), (d). A device is misbranded if it is promoted or marketed in a manner at variance with the label cleared by the FDA. 21 U.S.C. §§ 331, 352.

---

[1] In order to conduct such a clinical trial, the manufacturer must receive an investigational device exemption ("IDE"), which allows the manufacturer to legally ship the device for the purposes of conducting the trial on human test subjects (in vivo). 21 U.S.C. § 306j(g); 42 C.F.R. § 405.201(b).

9

30.     In addition to the above-described process, a device manufacturer must comply with the FDA's Commercial Good Manufacturing Practices ("CGMP") regulations.  21 U.S.C. § 360j(f).   The FDA's CGMP quality regulations impose on management with executive responsibility requirements including, for example, (a) the creation, retention, and review of design control files for each device (such as design history files, design input and output files, design review documents, design validation records, and design master records), 21 C.F.R. § 820.30; (b) document control procedures including the identity and date of all individuals approving documents, 21 C.F.R. § 820.40; (c) production and control requirements, 21 C.F.R. § 820.70; (d) device labeling regulations, 21 C.F.R. § 820.120; (e) record retention requirements, 21 C.F.R. § 820.180; and (f) the preparation of device master records, 21 C.F.R. § 820.181. Management with executive responsibility includes employees who have the authority to establish or make changes to the manufacturers quality policy and quality system.  21 C.F.R. § 820.3(n).   A device that is not manufactured in compliance with CGMP requirements is considered adulterated.  21 U.S.C. § 351(h).

**B.    The False Claims Acts**

31.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

32.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or

falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

33.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ."  31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

34.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

35.     Each of the Plaintiff States has individually enacted a False Claims Act.  Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above.  Relators assert claims under the State FCA's for the State portion of Medicaid false claims detailed in this complaint.

### C.     The Anti-Kickback Statute

36.     The Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute" or "AKS"), is violated by:

> (1)     whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind
>
>> (A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . .

11

(B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program

\* \* \*

(2)    whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person

(A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

(B)    to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

U.S.C. § 1320a-7b(b).

37.    A "Federal health care program" is defined as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. 42 U.S.C. § 1320a-7b(f). The Anti-Kickback Statute applies to claims submitted to Medicare, Medicaid, and the other government payers listed in this case for the purchase of the devices discussed herein, as well as services related to the use of these devices. 42 C.F.R. § 405.207.

38.    In May 2003, the Office of Inspector General ("OIG") issued a Program Guidance for Pharmaceutical Manufacturers ("OIG Report"). This guidance, since it interprets the Anti-Kickback statute, is equally applicable to device manufacturers. The guidance states:

Any time a pharmaceutical manufacturer provides anything of value to a physician who might prescribe the manufacturers product, the manufacturer should examine whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward referrals. For example, if goods or services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (*i.e.*, have independent value to the physician), or if items or services are sold to a physician at less than their fair market value, the arrangement may be problematic if the arrangement is

12

tied directly or indirectly to the generation of federal heath care program business for the manufacturer. Moreover, under the anti-kickback statute, neither a legitimate purpose for an arrangement (*e.g.*, physician education), nor a fair market value payment, will necessarily protect remuneration if there is also an illegal purpose (*i.e.*, the purposeful inducement of business).

### V.   THE FDA APPROVAL OF ONYX

39.    On July 8, 2003, Micro Therapuetics, Inc. ("MTI") submitted a Pre-market Approval ("PMA") to the FDA for Onyx, seeking permission to market Onyx "for use in the treatment of brain arteriovenous malformations ("BAVM's"), when embolization is indicated to minimize blood loss to reduce the BAVM size prior to surgery." The only physicians who treat BAVM's are interventional neuroradiologists ("INRs") and neurosurgeons. On July 21, 2005, Onyx was approved by the FDA, for the "[p]resurgical embolization of brain arteriovenous malformations." The label specifically stated that:

> safety and effectiveness has not been studied in the following patient populations:
>
> - Pregnant and nursing women
> - Individuals less than 18 years old
> - Individuals with . . . dural AV fistulas

40.    In addition to approving this narrow indication, the FDA required EV3 to include extensive information in the label regarding the risks associated with using Onyx.

41.    A review of the Onyx label reveals nearly two dozen warnings and precautions, along with significant commentary regarding adverse events associated with Onyx:

### WARNINGS

> - **The safety and effectiveness of the Onyx LES as a long term implant has not been established.** [emphasis added].
>
> - **Performing embolization to occlude blood vessels is a high risk procedure.   This device should be used only by physicians with neurointerventional training and a thorough knowledge of the**

13

**pathology to be treated, angiographic techniques, and super-selective embolization.** [emphasis added].

- AVM embolization may influence blood flow patterns, thereby subjecting arteries supplying the AVM or the brain proximal to the AVM to the increased pressures.   Increased arterial pressures could result in hemorrhagic complications.

- Animal experimentation has shown that when Onyx escapes outside the vascular space, as might occur if the vessel wall is compromised, a subacute inflammatory response to the material may occur.   Increased intracranial pressure due to un-reabsorbed Onyx material in this space may cause tissue damage.

- Therapeutic embolization should not be performed when high blood flow precludes safe infusion of the embolic agent.

- **The microcatheter tip should be placed so that embolization of the bAVM occurs distal to any arterial vessels that may supply normal brain tissue or cranial nerves.** [emphasis in original].

- Failure to continuously mix Onyx for the required time may result in inadequate suspension of the tantalum, resulting in inadequate fluoroscopic visualization during delivery (see instructions for use).Inject Onyx immediately after mixing.  If Onyx injection is delayed, tantalum settling can occur with the syringe resulting in poor visualization of Onyx during injection.

- Adequate fluoroscopic visualization must be maintained during Onyx delivery or non-target vessel embolization may result.  If visualization is lost at any time during the embolization procedure, **HALT** Onyx delivery until adequate visualization is re-established. [emphasis in original].

- Use only MTI micro catheters indicated for use in the neurovasculature, e.g., Marathon, Rebar and Ultraflow, and MTI syringes.  Other micro catheters or syringes may not be compatible with DMSO and their use can result in thromboembolic events due to catheter degradation.

- Do not allow more than 1 cm of Onyx to reflux back over catheter tip. Excessive Onyx reflux may result in difficult catheter removal.

- After using a micro catheter with Onyx, do not attempt to clear or inject any material through it.   Such attempts may lead to embolus or embolization of an unintended area.

- STOP injection if Onyx is not visualized exiting catheter tip. If the catheter becomes occluded, over-pressurization can occur. During Onyx injection, continuously verify that Onyx is exiting the catheter tip. Testing has shown that over-pressurization and rupture can occur if only a volume of 0.05 ml of Onyx is injected and is not visualized exiting the catheter tip.

- STOP injection if increased resistance to Onyx injection is observed. If increased resistance occurs, determine the cause (e.g., Onyx occlusion in catheter lumen) and replace the catheter. Do not attempt to clear or overcome resistance by applying increased injection pressure, as use of excessive pressure may result in catheter rupture and embolization of unintended areas.

- DO NOT interrupt Onyx injection for longer than two minutes prior to re-injection. Solidification off Onyx may occur at the catheter tip resulting in catheter occlusion, and use of excessive pressure to clear the catheter may result in catheter rupture.

## TRAINING

**Serious, including fatal, consequences could result with the use of the Onyx LES without adequate training. Contact your Micro Therapeutics Inc. sales representative for information on training courses.** [emphasis added].

## ADVERSE EVENTS

### Potential Adverse Effects of the Device on Health

A prospective, randomized, multi-center clinical trial compared Onyx LES to the TRUFILL n-Butyl cyanoacrylate (TRUFILL) liquid embolic system for the presurgical treatment of bABMs. The primary endpoint of the study required 10 patients to be evaluated for effectiveness. An additional 17 patients were enrolled under a continued access provision. Safety was evaluated for all 117 patients in the Intention to Treat (ITT) cohort, which includes all patients in which treatment of the assigned device was attempted. Safety was assessed based on the nature of adverse events.

The safety profile for the two groups was comparable. Many of the events occurred during, or post surgery as opposed to during or post embolization, with the emoblization agents.

Two patients died during the course of the clinical trial. Both deaths occurred in the Onyx group and both occurred following surgical resection. A third death occurred after the patient had been discharged to a rehabilitation center for persistent neurological deficits, but the patient had completed study follow-up.

42.     Significantly, the FDA expressly warned that Onyx was not approved as a long term implant, observing that "[t]he safety and effectiveness of Onyx as a long term implant has not been established." The label also specifically states that "safety and effectiveness has not been studied in the following patient populations . . . [i]ndividuals with . . . dural AV fistulas."

43.     Several years later, in early to mid-2008, EV3 sought to broaden the Onyx label. Specifically – in order to legitimize its already significant off-label marketing campaign – EV3 sought an approval for "peripheral" lesions, i.e., lesions outside the brain. EV3 hired experts to assist EV3 in its presentation to the FDA, including Dr. Darren Orbach from Massachusetts General Hospital. On or about September 8, 2008, the FDA specifically rejected EV3's request for a peripheral indication for Onyx.

## VI. THE MARKET FOR ONYX

44.     As noted above, the only indication for Onyx is the pre-surgical embolization of brain arteriovenous malformations. In other words, Onyx is designed to lessen the flow of blood to the BAVM lesion, prior to surgery, so that during the subsequent open-skull surgery there is less risk because the patient will lose less blood.

45.     The market for pre-surgical embolization of BAVM's is limited. It is estimated that only 3,000 BAVM's are treated each year in the United States. Moreover, only INR's and endovascular neurosurgeons perform such surgeries.     There are approximately 500 such physicians in the United States. Compounding the limits on the market for Onyx when used in a manner consistent with its FDA label is the fact that at all relevant times, Onyx had several competitors.

46.     In contrast, the off-label market for Onyx is exponentially larger, and the company was aware of the market potential of Onyx when used outside the brain. Indeed, the

16

National Marketing Manager for Onyx, Vitas Sipelis, completed a market study indicating that, at $500 per vial, the peripheral market would generate $150 million annually (at $2,250 a vial, which is the current price for Onyx, the annual market would be $675 million).

47.     This market study recognized that there are numerous types of non-BAVM lesions which can be experimented on with Onyx, and those various types of lesions can occur throughout the human body, from just outside the brain, to the neck, face, chest, arms, and legs. Using Onyx to treat any of these lesions is off-label.

48.     For example, dural arteriovenous fistulas are lesions which occur in the head, but outside the brain.  Onyx is not indicated for use in dural fistulas.  In fact, the label specifically states that the "safety and effectiveness has not been studied in . . . individuals with . . . dural AV fistulas."

49.     In addition to dural fistulas, there are myriad aneurysms and lesions throughout the body which can require embolization, including but not limited to peripheral aneurysms (i.e., aneurysms below the neck), tumors (both benign and malignant), portal veins, vericoceles, endovascular graph leaks ("type II endoleaks") and peripheral arteriovenous malformations. These types of lesions are commonly treated by vascular surgeons and interventional radiologists. Neither class of physician can use Onyx on-label. Although, as noted above, there are fewer than 500 endovascular neurosurgeons and INR's in the U.S., it is estimated that there are more than 15,000 vascular surgeons and interventional radiologists, none of which who have been formally trained with the use of Onyx and none of whom can use Onyx on-label.

50.     Not only are there many more off-label uses of Onyx than on-label uses, the off-label cases utilize many more vials of Onyx, per procedure, than on-label cases.  There are several reasons for this.  First, in the on-label setting, the physician is not using Onyx for

17

"complete cure," i.e., to solve the whole problem at once. Rather, the physician is simply is attempting to lessen the blood flow to the BAVM in advance of open-skull surgery, when the BAVM will surgically "clipped." However, in the off-label setting, the surgeon is normally seeking complete cure, and thus needs to use significantly more Onyx in order to fill the entire lesion and entirely stop blood flow into the lesion.

51.     Second, brain lesions are usually smaller than peripheral lesions, i.e., lesions in the brain typically have significantly less volume than lesions outside the brain. The larger the lesion, the more Onyx required to treat it. Relators estimate that the typical on-label procedure utilizes 1-2 vials of Onyx, but the average off-label procedure utilizes 5-15 vials.

52.     Third, in the case of latent (i.e., non-bleeding) BAVM's with a high treatment risk profile, doctors often would not perform a procedure because the risk of treatment outweighs the risk of doing nothing (and hoping the lesion will not rupture). In contrast, treating peripheral lesions is perceived as having less risk, so doctors are more likely to proactively treat latent lesions.

53.     During the relevant time period, the cost of Onyx was between $1,950 - $2,250 per vial. Utilizing an average of ten vials per off-label procedure, that is a product-only cost of $19,500 - $22,500 to the hospital, not to mention the other costs to the hospital in carrying out the surgery. Numerous government payers are reimbursing hospitals for these off-label uses of Onyx, both on a diagnosis related group ("DRG") basis, and on an "outlier" basis (when the cost of Onyx permits the hospital to bill government payers for costs which exceed the DRG payment). Due to the high cost of Onyx and the number of outlier procedures caused by its off-label use, the cost to government payers is certainly in the millions of dollars.

18

## VII.   KICKBACKS AND THE OFF-LABEL PROMOTION OF ONYX

54.    EV3 Neurovascular has marketed Onyx outside the U.S. and Canada since 2001. In 2006, EV3 formally acquired Micro Therapeutics, Inc. ("MTI"), including the rights to market Onyx in the U.S.

55.    At that time, MTI and EV3 were relatively immature companies.  There was no visible compliance department, and the Relators do not believe that in-house counsel – if indeed there was in-house counsel – played a significant role in the launch of the Onyx.  Due to the lack of internal oversight, and the economic pressure EV3 was under at the time, EV3's off-label marketing campaign was immediate, multi-faceted, and blatant.

### A.   The Onyx Training Program:  Creating the Off-label Pipeline

56.    On August 5, 2003, the FDA Neurological Devices Panel made several recommendations with respect to Onyx.   After noting that BAVM's are "relatively rare cerebrovascular lesions" the Panel recommended, as *a condition of approval*, that the training program be "mandatory for all users" and include the following:

- hands-on training using in vitro and in vivo models under fluoroscopic visualization, and

- newly trained physicians should have one proctored case; if the physicians first case is deemed a failure, the physician must conduct another proctored case.

57.    These recommendations were referenced and incorporated into the Onyx label on July 21, 2005.  Additionally, the label included other warnings and precautions.  For example, the label warned that:

Performing embolization to occlude blood vessels is a high risk procedure.  This device should be used only by physicians with neurointerventional training and a thorough knowledge of the pathology to be treated, angiographic techniques, and super-selective embolization.

19

58.     The label also specifically stated that "[s]erious, including fatal, consequences could result with the use of the Onyx LES without adequate training. Contact your Micro Therapuetics Inc. sales representative for information on training courses."

59.     Consequently, EV3 developed a training course. EV3 realized that the training course it developed could only be offered to INRs or neurosurgeons, since those were the only physicians who treated BAVM's. However, EV3 saw the training course as an opportunity to use individual neurosurgeons to "turn on the Onyx faucet" at his/her respective hospital(s), which led to widespread off-label usage of Onyx by untrained physicians who were later targeted by EV3's off-label promotional campaign.

60.     Under the protocol established by EV3's "Onyx Training Committee," surgeons selected by sales representatives and EV3 upper management would be flown to one or more EV3 training sites.     The training, which lasted as little as four hours, involved a didactic/technical review,[2] practice with a flow model (A small box with various liquids and tubes designed to simulate the flow of Onyx through veins and arteries), and hands-on in vivo injections of Onyx into an animal (normally a pig). Once this portion of the training was completed and the trainee was back at his/her hospital, the trainee also had to perform at least one successful proctored use of Onyx in a human being. These proctored events often involved off-label procedures, i.e., the EV3 proctor actually instructed the trainee how to use Onyx off-label.

61.     After those steps were completed, the trainee received a certificate stating that he/she was successfully trained on the use of Onyx. However, under EV3 policy, the "certification" was not specific to the individual physician, or even the hospital at which the

---

[2] As discussed in more detail below, this portion of the training included using Onyx in DAVF's, which is off-label.

20

physician performed the majority of his/her procedures.  Rather, to expand the market for Onyx as far as possible, EV3 instituted a "Site Certification Process."  Under this process, once a neurosurgeon completed EV3's training, any hospital (or "Site") at which the physician had privileges was considered a "Certified Site" and was thus approved "for the unrestricted shipment of the Onyx Liquid Embolic System."  Once a Site had been certified, EV3 management had no interest or motivation to provide training to additional physicians at that Site because any surgeon at the Site was able to access the Onyx supply chain.

62.     In this way, EV3 used the trainees it "certified" as portals to make Onyx available for on-label and off-label use to doctors across the country who had never received training on the use of Onyx.  Indeed, under EV3 policy, if a physician "already has approval we can open multiple sites for approval."  In other words, pursuant to EV3 policy, if one trained physician had surgical privileges at three hospitals, then all three hospitals qualified as Certified Sites and all physicians at all three hospitals could perform surgical procedures using Onyx, even though none of them had been trained.  Moreover, if the sole Onyx trained surgeon at a given hospital left that hospital for a second, the first hospital remained an EV3 Certified Site as to all physicians performing surgery there.  An example of this occurred at the Maine Medical Center.  The trained physician, Dr. Edward Kwan, left the hospital to work at a hospital in Massachusetts, yet EV3 continued to supply the Maine Medical Center with Onyx because it regarding the building as a "Certified Site."

63.     Similarly, it was not uncommon for EV3 personnel to open Certified Sites at hospitals where there were no endovascular neurosurgeons or INRs on staff or with privileges. For example, EV3 certified Mount Auburn Hospital in Massachusetts as a Site, even though it

21

had no Onyx-trained physicians on staff or with privileges. When relator D'Agostino raised this problem, he was told to keep it quiet, and the account was left open.

64.     These practices were openly discussed with management at regional and national meetings throughout the relevant time period. In this way, and in combination with a robust off-label marketing program further described below, thousands of untrained physicians were given free reign to perform Onyx procedures both on and off-label, despite the tremendous risks presented by such use.

65.     EV3 knew that as a consequence of its unreasonably expansive definition of a Certified Site, untrained physicians nationwide were being given access to Onyx to perform sophisticated, risk-laden surgery squarely contrary to FDA directives. EV3's solution to this problem was unsatisfactory and dangerous: the company place the burden of "training" these physicians on EV3 sales representatives. In fact, the company's written policy, dated September 6, 2006, stated that "ev3 Field representatives will offer training to additional physicians that have not attended the neurovascular training prior to product usage" including a "PowerPoint product review" and "hands-on bench model injections and demonstration." When sales representatives complained that they were not comfortable with this level of responsibility, EV3 urged them on, telling them things like "[d]on't hesitate to train-on-the-fly w/doc's you can coach during cases." EV3's "training program" is at odds with the FDA label, which states, *inter alia*, that:

> Performing embolization to occlude blood vessels is a high risk procedure. This device should be used only by physicians with neurointerventional training and a thorough knowledge of the pathology to be treated, angiographic techniques, and super-selective embolization.

22

**B.    Using Revenue Quotas to Drive Off-label Promotion**

66.    For purposes of promoting Onyx, EV3 had designated sales regions in the United States.  Each sales region was broken down into several territories.  Each sales representative was assigned responsibility for a given sales territory and was known as a "Territory Manager."

67.    Each sales representative was given a quota of how much Onyx and related products he/she was expected to sell during each financial quarter.  There was constant pressure on the sales representatives to meet their sales quotas, and they were routinely reminded by EV3 management that their future with the company was dependent on their sales performance.

68.    The sales quotas themselves drove off-label promotion, because the quotas could not be reached unless the sales representative successfully closed a huge percentage of off-label deals.

69.    Relator D'Agostino, for example, was placed in an untenable situation by EV3's quotas for Onyx sales.  For a given year, the company's own assessment of the on-label sales potential for BAVM procedures in his territory was $208,524, i.e., if the Relator was successful in capturing 100% of the BAVM business in his territory, he would sell a little over $200,000 of Onyx.  Notwithstanding that limited market, the Onyx revenue quota placed on the Relator in 2009 was $1,438,074.  In other words, Relator D'Agostino was required to sell more than $1.2 million dollars of off-label product during that calendar year to remain employed in good standing.  Similar quotas were placed on the other sales representatives.

70.    Individual meetings between management and sales representatives regarding quotas were common at EV3.  For example, in July of 2009, Relator D'Agostino's territory was re-aligned and his second largest account, most of which involved on-label sales, was given to another sales representative.  This greatly increased his difficulty in meeting his $1.4 million

23

sales quota. On September 9, 2009, Relator D'Agostino's regional manager, John Cubelic, scheduled a one-on-one meeting to discuss the Relator's sales performance. Specifically, Cubelic stated that he had serious concerns about Relator D'Agostino's performance in driving business and market share. During the meeting, Cubelic specifically challenged the Relator to raise his level of off-label sales to meet his quota, or he would face discipline or termination. Cubelic, likely aware that he had gone too far in his directive to promote off-label, followed up the meeting with a memo to Relator D'Agostino on September 14, 2009, in which he warned under threat of termination that their meeting must be kept strictly confidential:

> In addition, the conversation we have had regarding your performance is confidential and I expect you to treat it as such. Failure to comply with this could result in immediate dismissal from EV3 Neurovascular.
>
> Hitting your Q3 number is paramount and I need to make sure we have a balanced result across all territories in the Eastern Region.

### C.  Conference Calls, Regional Meetings, And National Sales Meetings

71.  From the beginning of Onyx promotion in 2005, management routinely utilized conference calls and sales meetings to demonstrate the potential of the off-label market for Onyx, and how to access that potential.

72.  Such conference calls and sales meetings typically started off with a discussion of the company's sales performance for the previous financial period, followed by the company's sales expectations for the future. Thereafter, the company provided its sales force with the means to achieve that end through off-label marketing.

73.  For example, during the Eastern Regional Conference Call on May 22, 2006 – attended by all of the regions salespeople, marketing managers, various vice-presidents, and regional manager John Cubelic – the company sponsored an entire Onyx presentation entitled

"Peripheral Applications: Basic Overview." Since all peripheral applications are outside the brain, they are *all* necessarily off-label.

74. True to its title, the presentation, led by Cubelic, was full of information regarding off-label applications of Onyx. These off-label applications included: a) Peripheral AVM's, b) Aortic Aneurysms, c) Peripheral Tumors, d) Portal Vein Embolization, e) Vericoceles, and f) Uterine Fibroid Tumors. The presentation started with a slide titled "Peripheral Opportunities," and provided sales representatives with talking points on how to sell Onyx in this off-label market. The presentation itself was augmented with comments from Cubelic and discussion with the salespeople regarding their "best practices" for off-label sales.

75. Regional Sales Meetings were also commonly utilized to spread off-label promotion messages. The Eastern Regional Sales Meeting in Atlanta in the Fall of 2006 is a good example. John Lidkey, the Director of Marketing for liquid embolics, gave an Onyx presentation. Lidkey first addressed the sales of Onyx, impressing upon the sales representatives how well Onyx was gaining in market share within the liquid embolics market. Thereafter, in a continued effort to spur additional market share gains, Lidkey delivered an entire presentation regarding peripheral (below the head) uses of Onyx, *all of which were off-label*. Rather than call these cases what they were, Lidkey introduced the terms "alternative uses" and "alternative applications." Notwithstanding these euphemisms, the bottom line is that sales representatives received explicit instructions on how to market Onyx for off-label purposes.

76. National Sales Meetings were also utilized by EV3 to drive off-label marketing. These meeting were regularly attended by EV3's President of Neurovascular, the Vice-President of Sales, the Vice-President of Marketing, the Vice-President of Research and Development, the

Director of Human Resources, and the entire National Sales Team including all regional sales managers and the Vice President of Sales and Global Marketing for Onyx, John Hardin.

77.    The January 2008 EV3 National Sales Meeting was held at the Surf and Sand Hotel in Laguna Beach, CA.  By the time of this meeting, EV3 realized it had significant exposure due to its previous off-label marketing efforts.  However, the company could not afford to give up its market share gains in the peripheral vascular market.  In its effort to satisfy these conflicting concerns – limiting exposure without losing market share – EV3 sent two completely contradictory messages to its sales force.  On the one hand, it told its salespeople that "if you receive a request for information regarding off-label use of our products, you may not provide [doctors] with [the materials we are about to give you], but must refer the request to Regulatory" [bracketing added].  On the other hand, the company spent almost the entire meeting training its sales force on how Onyx could be used in the peripheral vasculature.

78.    The primary Onyx presentation at the meeting was titled "This is our Time" and was led by the National Marketing Manager, Vitas Sipelis.  Attendees were walked through a PowerPoint which provided an overall view of EV3's strategy for 2008.  There were two primary takeaways from the presentation.  First, although EV3 sales representatives already were driven to meet quotas which required the overwhelming majority of their sales to be off-label, EV3 made it clear that was not enough.  Rather, EV3 stated its goal for 2008:  62% market share (as opposed to the 53% market share from 2007).  Second, there was a three-pronged strategy the company created to reach that goal:  a) continue the physician training and "education" program, b) utilize publications, case reports, and "physician referral" programs, and c) develop new products.

26

79.     Attendees were then told that, as to publications and case reports, they would soon receive "Case Report books for Neuro and PV [peripheral vasculature]" [bracketing added]. They were also asked to continue their Regional and Local efforts for dinners, "Embo Clubs," etc.[3]   With respect to converting physicians from competitor products, the sales force was instructed as follows:

- Engage in discussions about successful cases [including off-label cases]

- Sign them up for an Advanced Users Course [which teaches off-label uses][4]

- Use your Champion

  o   Get a small group together for a dinner, bring your busy Onyx users to show/share cases [including off-label cases], and get 1-2 part-time glue users [a competitor product] to see results of these Onyx cases.

[bracketing added].

Attendees were then asked "How do we increase account penetration?" EV3 provided its now-common off-label formula:

- Get users to think about additional applications (i.e., DAVFs)[an off-label use]

- Get users to advocate to their partners [regarding on and off-label uses]

- Support peripheral [off-label] applications when needed

[bracketing added].   In other words, the entire company was directed – in writing and by company leadership – to promote "additional" and "peripheral" uses of Onyx.  All "additional" and "peripheral" uses of Onyx are off-label, since there is only one on-label use:  the pre-surgical embolization of BAVM's.

---

[3]The Embo Club is discussed below in Section VII(I).
[4]See below in Section VII(D).

80.     Another part of the meeting involved a presentation by Dr. Stephen Kee, an interventional radiologist whose practice focused exclusively on non-BAVM lesions. John Hardin, Vice President of Sales and Global Marketing for Onyx, introduced Dr. Kee to the audience. After a boilerplate disclaimer, Hardin explained that Kee was present to show the sales force various uses of Onyx in the peripheral vasculature. Attendees were given a binder of "Case Reports" which included more than a dozen off-label uses of Onyx in the peripheral vascular setting. Dr. Kee then took the podium and, utilizing the easel for drawing purposes, spent more than two hours walking attendees through various potential off-label uses of Onyx on non-brain and peripheral lesions.

81.     Dr. Kee, after telling the sales representatives how to target the peripheral cases that would be "appropriate" for Onyx, then discussed how to advise customers – both hospitals and physicians – to maximize reimbursement through the use of Onyx. Further, he discussed additional billing codes that were applicable to peripheral vascular procedures.

82.     At that same January 2008 meeting, National Marketing Manager Vitas Sipelis took advantage of the assembled sales force to launch a powerful off-label campaign called "Own the Vein." Prior to analyzing the Own the Vein campaign, it is important to know that for the on-label use of Onyx, endovascular neurosurgeons scrupulously avoid allowing any Onyx to escape into any veins because the results can be traumatic, and even fatal. Rather, they attempt to utilize Onyx solely in the arteries. Contrariwise, when performing procedures outside the brain – such as dural fistulas, body tumors, peripheral AVM's, and other off-label indications – the opposite is true: one of the goals of the procedure is to cut off veinous draining of the lesion(s). Consequently, Onyx is directly injected into the patients veins.

83.     The Own the Vein training guide included the following express components:

28

**What is it?**

- Detailed overview of venous anatomy [all off-label]

- Definitions, symptoms, and classifications of Dural Arteriovenous Fistulas (DAVF) and Carotid Cavernous Fistulas (CCF) [all off-label]

- Literature Review of DAVF and CCF [all off-label]

**Why is it important?**

- Onyx is the only liquid embolic agent available that allows venous access to the lesion [i.e., in the off-label vein market, we have no competition, so off-label venous usage is a great sales pitch]

- Becoming familiar with venous anatomy and procedures can help drive growth in new Onyx business [i.e., we are teaching you this to sell and drive growth, not to answer unsolicited questions from surgeons as we told you in the disclaimer]

[bracketing added].

84.     Participants were given a 78 page document titled "Own the Vein: A Review of Anatomy and Literature," and then underwent: 1) intense non-brain anatomy training, 2) a detailed review of the symptoms, classification, and treatment approach for DAVF and CCF lesions (which are both off-label), and 3) a comprehensive review of clinical papers and literature on how to use Onyx in the context of DAVF and CCF lesions.  After providing attendees with a month to study the Own the Vein materials, EV3 designed an inter-regional contest which required the national sales force to take a two hour test designed to determine their level of knowledge regarding how Onyx could be used in the venous, off-label setting.

85.     In summary, the January 2008 National Sales Meeting provided participants with: a) a refresher on how to combine inducements (referral dinners and Embo Club dinners) with off-label case reports to drive Onyx business, b) hands-on training with a peripheral surgeon who taught salespeople how to promote and bill Onyx for peripheral uses, and c) a comprehensive